Good morning, your honors, and may it please the court. My name is Jane Fleming. I am here with my colleague Ray Cardozo. We are with Reed Smith. We represent the petitioner, Ms. Garcia-Martinez. Also here today are Karen Musalo and Stephen Knight, and they are amicus curiae in the case. We'd like to start with the heart of the issue, which is whether or not Ms. Garcia established persecution on account of one of the enumerated grounds in the Immigration and Nationality Act. The immigration judge found that she did not satisfy the nexus requirements, so that's what we're going to focus our attention on today. There are three facts that are critical to the analysis that I would like to highlight. The first is that Ms. Garcia-Martinez was gang raped by three military soldiers in her home. The second is that the Guatemalan military engaged in a pattern and practice of rape of women in this small village of 200 people. And the third critical fact is that the military's pattern and practice of systematic rape of women only began after guerrilla fighters began forcibly conscripting men from this village. Now, the IJ found that those facts taken together did not compel the conclusion that Ms. Garcia established persecution on account of an enumerated ground. That result is incorrect for three reasons. The evidence compels the contrary conclusion. The immigration judge's findings are not supported by evidence in the record, and the immigration judge's analysis is legally erroneous. I'd like to begin with the record. Ms. Garcia testified on direct examination that the reason that Guatemalan military soldiers broke into her home, tied up her family, and gang raped her is because they thought that her family and the village were aligned with guerrilla fighters. That is at the administrative record at pages 234 and 239. She repeated that testimony on cross-examination. She again said, I think the reason they raped me is because they thought I was on the side of the guerrillas. That cross-examination testimony is at the administrative record, pages 257 and 261. Now, under this Court's precedent, and I'm referring specifically to the case Shofura, which is 228 Fed 3rd, 1070, an applicant's credible testimony taken alone is sufficient to establish the nexus requirement. Here, the direct testimony should have compelled the conclusion that Ms. Garcia established the nexus requirement. But even if she hadn't provided that direct testimony about the motivation of the military soldiers who assaulted her, she provided circumstantial evidence of the events surrounding her sexual assault. She drew a temporal relationship between the appearance of guerrillas in her village and the forced conscription of 20 men from her village of 200, and the subsequent appearance of the Guatemalan military soldiers. That temporal relationship is important because it shows a connection between the military's practice of raping women and the guerrillas' activity in the village. In addition to drawing the temporal relationship, Ms. Garcia testified about a pattern on the part of military soldiers of raping women in this village. She testified that the military came roughly once every 8 to 15 days and raped a woman. She testified that this went on for a period of years. That testimony about the systematic practice of rape in Ms. Garcia's village is in the administrative record at pages 252 to 253. Now, under this court's precedent, when an applicant establishes a pattern and practice of persecution of a particular segment of the society, that alien's individualized showing is less and not more. The court can find that standard in this court's opinion in Chand, which is at 222-Fed3-SB6. The question, of course, is whether we have to find it under the case law. And as you know, the IJ found that this was really amounted to a series of criminal acts, right, and not really persecution on account of a protected ground. What's in the record that says, you know, we're compelled to find the contrary? The evidence in the record taken as a whole, and we do have to consider the whole story, compels only one conclusion, and that is that Ms. Garcia was persecuted because of an imputed temporal relationship between the guerrilla activity and the military soldiers. We also can look at documentary evidence in the record, which establishes that the military soldiers in Guatemala used mass rape as a tool of subjugation of any perceived enemy. That evidence taken together, coupled with the experience that she suffered, compels the conclusion. Now, we can look at the immigration judge's reasoning. The immigration judge offered two reasons for concluding that the Nexus requirement was not satisfied. And as you noted, Judge Tashima, the first was that this was a mere criminal act by a soldier. The second reason the immigration judge offered was there was no evidence in the record, she said, to establish that these acts were carried out by a force that the government was unable or unwilling to control. Now as to the first, whether this is a, quote, mere criminal act by a soldier, to begin with it was three soldiers, not one. In addition, no one is disputing that activity on the part of the soldiers was a crime, but that's only the first step in the analysis, and the immigration judge should not have stopped there. The essential question, which is what we're here today discussing, is whether there was a Nexus. True, it was a crime, but why did they seek out this village? Why this woman to commit this crime against her family? That's the question that the immigration judge failed to answer, but the evidence compels the conclusion that it was because this village was identified with guerrillas. The second reason that the immigration judge offered simply makes no sense. She said there's no evidence in the record to show that this was a force the government was unwilling to control. It was a burden of establishing that the government could not control itself. That standard only applies in cases involving non-state actors. Well, didn't she also testify that people reported this to the local police, and the police would tell the Army, and then the Army would go in and take retribution, even kill the people who had reported to the police. Is that right? That's absolutely right, Judge Thompson. She testified, and I was going to say that even if that were her standard, which it wasn't, she certainly satisfied it when she testified that people who would report to the police would later have the military come back and kill them. She provided one graphic description of a family of eight people who were murdered and left on their front lawn for the rest of the village to see. Now there's a message, there's a political message in that activity by the military, which is, we are here, we are present, and we think that we are going to subjugate this village because it's aligned with the guerrillas, or because they believed it was aligned with the guerrillas. So she did establish acquiescence. Ms. Fleming, was there a period of time when the military came in, first the guerrillas were there conscripting males from the village, and then when the military came in, was there a time of relative peace before all of this activity started by the military? No, there was not, Your Honor. Her testimony was essentially, the guerrillas began forcibly conscripting individuals, men from the village, 20 out of a village of 200. She said, after the guerrillas came, the military came. But they didn't come to protect us, she said. They came and killed the women and children, and they came and raped the women. So they weren't there to protect us. The one event of the arrival of the military followed the leaving of the guerrillas, and it was close in time or something, or was it? Well, she didn't describe exactly how many days or how many months in terms of a temporal relationship, but she said, after the guerrillas came, the military came, she used the word after. So there wasn't a specific temporal period mark put on that. I think in addition to the issue of whether this was mere criminal activity, we have to focus on the fact that the immigration judge didn't treat this as a case of state action. And we know that the lens that we look through in cases where the government is involved is slightly different. We know under this Court's opinion in Hernandez-Ortiz, for example, that where the military is involved or the state is involved in persecuting an individual, unless there's a reasonable basis for concluding there was some justification for their activity, the most reasonable inference is that it was because of one of the enumerated grounds. Hernandez-Ortiz is at 777 FedSec and 509, and it has recently been reinforced by this Court's opinion in Navis. Now, the immigration judge did not apply that inference in this case, and that was a mistake as well. The other reason we can't see this as mere criminal activity is because we have to look at what happened to this family that night. This was not, as the government suggests, a mere act of carnal desire. Military soldiers went to Ms. Garcia's home. They broke into the home at night. They beat her father. They beat her mother. They then tied her father up in the backyard, and they forced her mother to cook for them while they gang-raped her 19-year-old daughter. That is not mere criminal activity on the part of a soldier. The obvious message in that event was domination, subjugation, and the reason they wanted to dominate was to be sure that the message was clear that guerrilla activity would not be tolerated in this village. Now, granted, if you take one piece of this evidence, that should be enough to compel the conclusion that this was persecution on account of an enumerated ground, but when you take all of this evidence together and consider the record as a whole, we have a pattern and practice of violence on a systematic basis by the military against this village that has at least an imputed connection to guerrillas because men have been forcibly conscripted. When you look at all of that evidence plus the documentary evidence which establishes that the military used this as a war tactic, the only possible conclusion is that it was because of one of the enumerated grounds. Then the question becomes what next? Assuming she established past persecution, which she did, what should happen? Well, Ms. Garcia is eligible for a humanitarian grant of asylum under this court's opinions in Lopez-Galarza and also more recently in law. What the court has recognized is that rape is an atrocious form of harm, particularly when it is at the hands of the state, particularly under the circumstances here where she was raped in the presence of her family. Her father was tied up in the back. Her mother was in the kitchen cooking. She testified about the horrific experience. She testified about her continuing fears over that experience and her fear of the military. Under Lopez-Galarza, that level of atrocity creates a new framework for us to work within, which is that she is entitled to a humanitarian exception and does not have to prove fear of future persecution. If the court has no questions, I would prefer to reserve the remainder of my time for rebuttal. That's fine. You may do so. We'll hear from the government then. May it please the Court, James Grimes for the government. Your Honors, Petitioner Garcia is not entitled to asylum because, as the immigration judge determined, she did not demonstrate that she was raped on account of a statutorily protected ground. Under this law, the government will certainly acknowledge that Ms. Garcia suffered a horrible crime, a horrible abuse, a horrible trauma, that rape is a violent act, and that she of course presents a sympathetic applicant. There's no doubt about that. We'll also concede that rape can constitute persecution in an appropriate case. But the law is clear. Unless an asylum applicant can demonstrate that the abuse that he or she endured, be it rape, beating, or what have you, was on account of a statutorily protected ground, that applicant will not be entitled to asylum, no matter how sympathetic her case. But what about her testimony? If her testimony is credible and there is no adverse credibility determination, why doesn't her testimony do it? That's true, Your Honor. There was no adverse credibility determination. But as this Court pointed out in Ochave, the fact that she actually believed why the soldiers attacked her does not mean that is why. That just means that she literally believed it. That doesn't establish the actual objective facts. That establishes the subjective facts. And we can take what she the facts that she testified about as being true. And one of the key facts that was not addressed in the initial argument, and that is what her attackers told her. That the immigration judge relied on. Her attackers told her that they were attacking her because they wanted to be with a woman. Just as the attackers in Ochave said they were satisfied getting what they wanted. But counsel, the motivation for protected ground need not be the only motivations. There can be other motivations, can't there? Certainly. And if there were evidence of other motivations, I might agree with that, Your Honor. Representative, my esteemed colleague's first argument, initial argument, and that is that first, the issue of the temporal connection, I believe, page 238 of the record, she said that the guerrilla, excuse me, the soldiers came years later. And so arguing that that, and I believe that's her nexus argument. That because the soldiers came after the guerrillas, therefore they must have come because of the guerrillas. Well, that's a coincidental correlation. It's a logical fallacy. It's the same thing as saying that Are you saying that if the retribution is delayed, it's not retribution? No, I'm saying that if the retribution is delayed, if there is retribution, just because one follows another doesn't mean that it was caused by the other. What about her testimony that the guerrillas came systematically through the village and took men for the guerrillas? I'm sorry, Your Honor? What about her testimony that the guerrillas came systematically to the village conscripting men for guerrilla warfare, and then the soldiers came after that? Years later. Yeah, because of their perception that this was a guerrilla stronghold. That was her testimony. That was her opinion that that was why they came. I'm not aware It's credible, so we have to accept it. We have to accept that she believed it. This Court said in Ochave, you would have to accept that she believed it. But you don't, that doesn't mean that it's true. If she believes in Santa Claus, literally, it doesn't mean that Santa Claus exists. It means that she literally believed it. But if there's objective, I mean, there's nothing in the record to indicate anything other than the fact that the guerrillas came and conscripted the villagers, and then the soldiers came and conscripted. So the fact that she believed it is corroborated by the, there's nothing else in the record to refute her belief. That is a logical fallacy. It's like saying, I ate an apple and I won the lottery the next day, and therefore I must have won the lottery. There would be a record as to who won the lottery. Sure. The fact that you ate an apple the day before doesn't mean that that's why you won the lottery. There has to be some indication of why they were doing it. She has that opinion. She honestly believed that. That doesn't mean that that is why it occurred. Mr. Bramson, isn't her, I guess what you've classified as her subjective belief corroborated by the, you know, the documentary evidence about what happened in Guatemala during this period? I mean, you know, reports like the, which we had just in one of the previous cases by the Historical Clarification Commission about the widespread use of rape as a, you know, instrument of subjugation by the Guatemalan army. In this record, the evidence talks to atrocities regarding razing of villages and things of that matter. Petitioner has alluded to evidence of mass rape. The only evidence of mass rape that I'm aware of with regard to this case is found between the green covers of Amikus's brief. It's not in this record. Her burden is to show that this record compels reversal. Her burden is not to show that evidence that she didn't present compels reversal. If she wants to rely on that evidence, her path is clear under the statute, and that is file a motion to reopen and have the agency address that evidence in the first instance. She does present a sympathetic applicant, but that doesn't mean that she's entitled to asylum. It doesn't mean that this court can ignore the fact that by statute it doesn't have jurisdiction to consider evidence that wasn't presented. But our case law does say that the applicant's testimony alone may be sufficient to establish persecution. Yes. What else could she have brought in? I'm sorry? What other evidence could she have brought in? She could have presented the evidence that's found in Amikus's brief that could have shown some correlation as to why the soldiers were there. This case is very similar to a chopper. So you're saying that an unlearned petitioner has the obligation to bring in evidence in addition to her testimony? What case are you relying upon? Your Honor, I'm relying on the statute. She's not, she doesn't have the ability to do that. I'm sure this Court has seen a number of cases in which the appellant, excuse me, the petitioner presents hundreds of pages of documents about country conditions. In fact, those documents were presented in this case. They're in this record. There were documents about, not the documents, there are documents that were presented is what I mean. They're in this record. Not the documents that are in the Amikus brief. So she certainly demonstrated an ability to do that. She needs, just because she believed it was so doesn't not mean it was so. Just as in Ochave, there's no evidence. But that testimony, what do you do with that case law that says if it's credible testimony by the alien, that's sufficient to establish persecution? What do you do with that? I don't believe that that case law says that just because someone believes something. If you're talking about a factual testimony about, if she testifies credibly that she was beaten, or that someone said something to her, or did something, then yes, you have to accept that is true. And you have to accept that she believed it. She established the subjective component. Certainly. But there are two components to establishing asylum. She has to show that they actually did it for that reason. And that's what this Court held in Ochave. This Court specifically said that in Ochave. That just because she believes it is so doesn't mean that it is so. I believe at page 866 of that opinion. Possibly 865. Just as in Ochave, these, her attackers didn't mention anything about gorillas. They didn't mention anything about her brother. And incidentally, her case before the immigration judge was different than her case here. Before the immigration judge, she said at page, in response to questions from her counsel, that she was attacked because her brother had been conscripted. She said that at page 243 and 257. Now, I recognize that Ms. Garcia says that those responses were in the context of what was going on in her village. But I invite this Court's attention to page 243 of the record and see that she's actually talking about what happened on that particular night. And of course, the real question is, is there substantial evidence in this record that supports the immigration judge's decision? The substantial evidence is what her attackers told her. In Ochave, the attackers said that they were satisfied getting what they wanted. And this Court at page 863 of that opinion italicized that language as if to emphasize the importance of what the attackers say about their motivation. That's the only objective evidence of motivation in this record. So it was completely reason for the immigration judge to rely on that. And in fact, for this Court to find that the record compels reversal, this Court would have to ignore Ms. Garcia's testimony that she didn't know why she was being attacked, but she guessed that it was because her brother had been kidnapped 10 years before. And you would have to ignore the fact that she testified that her attackers told her why they were doing what they did. Mr. Grimes? Yes, Your Honor. I'm concerned because I was struck by the argument made by Ms. Fleming that appears at page 29 of her blue brief. And I don't know if you want to grab that. I think it would be helpful if you did. Turn to page 29. I have it, Your Honor. Okay. It says in the first bold there, if there is no evidence of a legitimate prosecutorial purpose from a government's harassment of persons, courts ordinarily infer the motive is based on an enumerated ground. Ms. Fleming talked about this. And then it goes on about that. That's a 1985 case in that it's been apparently underscored by later cases. And that one, the Navis case. What about that, where there's no reason for this army to come in there, plant itself in this village or nearby, and just systematically go about raping and punishing this village over and over and over again? These cases would say that, well, from that would arise, I think they talked about a presumption, but maybe at least an assumption. Can we take anything from that? I think what I would point to are, I know there are cases from this Court that address the issue of rape. And this Court has certainly said that rape can constitute persecution on account of a choke and beating over the head a number of times. Right. And I think such as one case as Lopez-Galarza. But I think the key there is, for instance in Lopez-Galarza, is the Court said there was no evidence to the contrary. If there's no evidence to the contrary, then you can assume that. Here you have the evidence to the contrary. You have more than just the fact. You have the soldiers saying, we want a woman. Right. You have more than that. And in fact, Chavez, the Court said that was particularly relevant. You have the fact that they were concerned that this not be reported to the police, page 243 of the record. If they were acting systematically, it seems unusual that they would care whether or not the police knew, because apparently, as Petitioner is arguing, the government was involved. Well, every now and then you get an honest cop, too, you know. I suppose. I guess she's arguing that the government must have been involved because they were wearing their uniforms. That presupposes that soldiers who are out on patrol can go home and change their uniforms, or that criminals will be smart enough to think to do that. I don't think that the record compels this Court to conclude that that would be the case. I don't believe that that's supported by the record or by reality. Her nexus argument really comes down to, and I believe she says this at page 33 of her brief, that because the soldiers came afterward, they must have come because of the guerrillas. But they came years later, and there's no indication in this record. I was wondering about that. I thought there was an interval of time, but Ms. Fleming seemed to indicate it was not so. But was there a lapse of years? 238 of the record, Your Honor. She says years. It's years. The guerrilla's there, then years later, the Army comes in. Yes, Your Honor. Then when the Army is in, do they immediately start punishing and raping and all of this, or does a period of time go by? When they first show up, I don't know, Your Honor. I can't say whether there's a period of time. I can say that they came to her house once, once in, I guess, the 10 years since her brother had been kidnapped. Well, I thought the record was that she said that when she was about 13, the military began coming to the village like the guerrillas. Yes, that would have been about 1986 or 87. 83 was when her brother was kidnapped, so I guess that would be about three or four years later. And so she said that the military had never come to the village before that point, before the guerrillas started coming. So I guess that's about three or four years, I think, to answer Your Honor's question. Garcia appears to be arguing, I would say that if you look at her reply brief at page four, that because her persecutors chose the persecutor via rape, that the attack must necessarily have been on account of protected ground. And I don't think this Court can hold that, because to hold that would be to read the on-account-of requirement out of the statute. And it would also be contrary to this Court's decision in Ochave at page 864 of that opinion, where the Court said that even if you've been the victim of a rape, you still have to show that the assault was on account of a protected ground. Counsel, what do you make of the testimony that, of the petitioner, that when some of the neighbors reported the military assaults to the police, that family was killed? That shows that you can draw a few different conclusions from that, potential conclusions. You can conclude, possibly, that the police were in league with the soldiers. Or you can conclude that the soldiers were trying to cover up their involvement. I mean, I believe that what her testimony was, that she was told that's what had happened. How she would – how that person – She saw firsthand what happened to those who reported military assaults. But what I'm saying is that she was told why they had been killed. And I believe that that's – But she was considered credible. There's no question about whether or not that was truly what happened. Sure. Sure. That is – someone did tell her that. Whether that person told her that, accurately reported that information, is a whole other question. No, but that was never questioned by the immigration judge as to whether that was an accurate characterization of what happened. I believe that – Why it happened. I believe the immigration judge found that she did not demonstrate that she had been attacked on account of – and, in fact, that is why we're here. She, Ms. Garcia, has also relied on the evidence of crime and civil strife in Guatemala right now, or at the time of her hearing. And that evidence, crime and civil strife, of course, under Ochave, does not qualify her for asylum. And it doesn't demonstrate that the soldiers who attacked her in 1993 attacked her on account of any protected ground. So, because the IJ accepted her testimony as credible, you're saying that the IJ had to believe that someone in the village reported a military assault to the police and they were then killed and that – No, Your Honor, I'm not. If she didn't make an adverse credibility determination, she had to accept all this is true and nevertheless say that there was no nexus between that and a political opinion. Perhaps I'm not being clear, Your Honor. The immigration judge accepted as true as everything that she – everything she believed. She accepted that Ms. Garcia actually believed those things. That doesn't mean that those things occurred on the basis that she believed they occurred. Well, so what language in the IJ opinion are you relying upon to make that distinction between the fact that the IJ believes she believed that but not that it actually happened? By the fact that the immigration judge found that she hadn't shown that the rape was on account of a protected ground. Well, the IJ could still believe everything that she said was true and say that doesn't rise to the level of persecution. If the immigration judge believed that the soldiers had come because of the guerrillas and because they were being – No, I'm talking about when she said that someone in the family had reported an earlier attack by the police – by the military to the police and the military soldiers had returned and killed the family. Are you saying that the IJ rejected that testimony? No. That she – she believed that that was the case. I mean, the immigration judge accepted that. I will – I want to point out that Ms. Garcia has argued that she has shown past persecution and therefore she had – there was a presumption that arose of future persecution or well-founded fear of future persecution. Under the regulation and by definition, if she doesn't meet her burden of showing past persecution, the government has no burden to her but showing a future persecution. In fact, in Navas, a case in which she relies on reply briefs, this Court said just that. It's quite reasonable for the agency not to address those matters if the immigration judge finds that she hadn't shown past persecution. That's what happened here. The immigration judge found she hadn't shown past persecution, so the presumption – But it was in the alternative. You could show past persecution or a well-founded fear of future persecution. That's correct. You can – you could show either. And what she's talking about is that she's saying that she showed past persecution and therefore she had a presumption of future persecution. And that presumption didn't arise under HCFR 208.13b1 because the immigration judge found that she hadn't shown past persecution. And that's why the immigration judge didn't address the issues of change in country conditions or things of that matter. Ms. Garcia says in her reply brief there was no evidence presented addressing the issue of the possibility of future persecution, but to the contrary, the immigration judge actually talked about some of that evidence at pages 206 and 210 of the record. So there actually is evidence that might rebut that showing if it had been relevant, but it didn't come up. Now, my final argument is that Ms. Garcia did not raise her withholding or torture convention claims before the board. And of course, she is required to exhaust administrative remedies. That exhaustion requirement is jurisdictional and cannot be waived. Therefore this court cannot consider those issues. I know that she relies on HCFR 208.3b, but that provision merely says that an asylum application will be considered as a withholding application. It has nothing to do with the board's consideration of issues or the board's jurisdiction, and certainly has nothing to do with this court's jurisdiction. Also as to exhaustion, her particular social group claim before the board was couched as a particular social group composed of residents of her village at pages 29 and 36 of the record. She now argues at page 27 of her brief that it's a particular social group of rural women from her village. But that's a different particular social group, and this court has no jurisdiction to consider this different particular social group. I would just like to be clear, the government's position is not that rape is not a horrible crime and it is not that women who have been raped on account of a statutorily protected ground cannot get asylum. It is simply that unless an asylum applicant shows persecution on account of, she will not be entitled to asylum. Thank you. All right. Thank you, Mr. Grimes. A rebuttal? I'd like to start out by reinforcing the presumption in Hernandez-Ortiz in distinguishing Ochave because those cases stand diametrically opposed to one another. Ochave is not a case of government action. It is a case, the alien is from the Philippines. She was assaulted on the street by a non-state actor. Hernandez-Ortiz is a case involving action by the state, and the, whether we call it a presumption or reasonable inference, is that the action is based on an enumerated ground. Counsel, what's your response to opposing counsel's argument that merely because the Well, I think that every case that has considered violence by the military has treated it as state action. This case in particular, they broke into her home. Perhaps had they been on the street, not in uniform, we wouldn't be treating this as state action, but they were in uniform. They were carrying machine guns. They broke into her home, and they were clothed in the military's clothing. If we look at this court's opinion in Lopez Galarza, that case involved a military colonel who essentially raped and assaulted a woman. And this court emphasized in that case that he attacked her with his guns and grenades and that he basically was the, you know, the power that he was bringing to play in that dynamic was the power of the state and the military. So I hardly think that we can characterize this experience where these individuals broke into Ms. Garcia's home and beat her father and mother as anything less than military action like in those other cases. And would you please respond to opposing counsel's separation of the petitioner's belief in the truth of her statements and the fact that that's not sufficient to make it so that it actually happened? Well, let's look at Shafara. I mean, in that case, the applicant was from Ethiopia. She was raped by a public official on direct examination. She was asked why did she think that she was raped. She said, I think maybe it was because I was attractive. She later was asked again, and she said, I think it was because of my ethnicity. That testimony on direct examination was sufficient to establish the nexus in that case. And true, it may have been a subjective belief, but it was her credible testimony which elevated out of the realm of mere subjectivity into the realm of, you know, evidence to establish a nexus requirement. But we don't have to rest just on that testimony. That is enough. But we have more. We have circumstantial evidence here, as I described earlier, of a pattern in practice of systematic violence against women in this village. And just to pin down the exact testimony on the temporal relationship, because it is an issue that has been confusing, I will read what she said. She said, and this is at page 234 of the administrative record, our opinion was that the guerrillas would come to the town to kidnap the people and beat them, and people who resisted them are killed. We thought the soldiers, the military, were there to protect us, but years after the guerrillas started to come, the military soldiers also started to come to harm the people. They beat the men, women, children. They raped the women. Now, she didn't say there was a three-year lapse between when the guerrillas came and when the military came. She said her brother was kidnapped in 1983. The guerrillas continued to kidnap men from the village. There were 20 men total. Now, in this testimony, she says, true, years after the guerrillas started to come, the military started to come. But she didn't say the guerrillas stopped coming, so we can't necessarily infer that there was a three-year lapse in time where nothing happened. She says the same thing again, and I won't read it again, but she basically says the same testimony again at page 238 and 239 of the record. Now, as far as documentary evidence in the record, the government suggests that what we have done is try to supplement the record on appeal, and that is not at all the case. And I will direct the court to some documentary evidence, which the immigration judge had before her, which is quite relevant to whether or not mass rape was used as a tool of subjugation during the Guatemalan War. At page 419 of the record, there is an article that says numerous women were victims of rape, forced pregnancies, and sexual enslavement in military command posts. At page 479 of the record, there is an article that says the brutal characteristics of these massacres include torture, rape, murder of men, women, children, and the elderly, acts so inhuman that it was as if, in the eyes of the state, the victims were not human beings. So there is documentary evidence in the record. And we are not resting merely on the amicus brief, although that certainly paints a picture which is quite compelling in light of the facts in this record, which is what we are relying on. In terms of the question of the testimony about the brother, she did testify that her brother was kidnapped. That obviously was quite a scarring experience for her. But when she was asked, why did you think you were raped by these soldiers? She said, because we thought that the soldiers thought we were on the side of the guerrillas. True, her brother was kidnapped by guerrillas, but she didn't leave it at that. She talked about the other 19 men who were kidnapped as well. So that was the context that she provided to fill in the detail, which is what the government leaves out. What's interesting is that the government suggests that the soldiers' statement that they just wanted to eat and be with a woman provides objective evidence of their motive, and yet her testimony that they came because of the guerrillas does not supply adequate evidence of nexus. Now I think it would be hard for us to believe that these military soldiers singled out women in this village on a systematic basis, and this family in particular, merely because they wanted to be with a woman. And if we look at the particular experience of this family, it clearly was not about carnal desire or sexual activity. It was about domination and control because of an imputed affiliation with guerrillas. If there are no further questions. Thank you very much. All right. Thank you, Ms. Fleming. Thank you, Mr. Grimes. This case is now submitted for decision. That being the last case on today's calendar, we'll now stand in adjournment.
judges: Thompson, Tashima, Rawlinson